# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF NORTH CAROLINA
# CHARLOTTE DIVISION

## DOCKET NO. 3:08-cv-00044-FDW

| | |
|---|---|
| NATIONAL ASSOCIATION FOR STOCK CAR AUTO RACING, INC., et al., | )<br>)<br>)<br>) |
| Plaintiffs, | )       **ORDER**<br>) |
| vs. | )<br>) |
| VARIOUS JOHN AND JANE DOES, et al., | )<br>)<br>) |
| Defendants. | )<br>) |

THIS MATTER comes now before the Court *sua sponte* to address the standards and procedures for the disposition of counterfeit goods seized pursuant to the Trademark Counterfeiting Act of 1984 ("The Act"), 15 U.S.C. § 1116-1118.

## **BACKGROUND**

This is an action for a violation of the Lanham Act, 15 U.S.C. § 1051, et seq. Specifically, Plaintiffs' Verified Complaint alleges that Defendants are producing and selling counterfeit merchandise that infringes Plaintiffs' trademarks. On February 8, 2008, based upon the verified allegations in Plaintiffs' Complaint and Motion for Temporary Restraining Order ("TRO") and Seizure Order, the Court entered an ex parte TRO and Seizure Order pursuant to 15 U.S.C. § 1116.[1]

---

[1] In making this determination, the Court made the requisite findings of fact under § 1116(d)(4). In particular, the Court found that Plaintiffs were "likely to succeed in showing that the person against whom seizure would be ordered used a counterfeit mark in connection with the sale, offering for sale, or distribution of goods or services." 15 U.S.C. § 1116(d)(4)(B)(iii). The Court notes that this "likely to succeed" standard is necessarily a higher standard than the probable cause required for seizures under the Fourth Amendment. United States v. $95,945.18, U.S. Currency, 913 F.2d 1106, 1110 (4th Cir. 1990) (defining probable cause as "reasonable ground for belief of guilt, supported by less than prima facie proof but more than mere suspicion").

Between February 8 and February 13, Plaintiffs served Defendant Frank Parsons with the Seizure Order and seized certain counterfeit items from him. On February 14, 2008, the Court extended the Seizure Order and TRO until February 20, 2008, and ordered that a hearing for a preliminary injunction be held on February 28, 2008. In anticipation of that hearing, and in order to comply with the notice requirement in Federal Rule of Civil Procedure 65(a)(1), Plaintiffs and the Court needed to devise a method of putting Defendants on notice. Only one individual Defendant had been identified at that point, soon followed by nine more before the hearing, but other Defendants remained unknown because of the nature of the business in which they are allegedly engaged.[2] The Court turned to the rule adopted by the United States Supreme Court in Mullane v. Cent. Hanover Bank & Trust Co., 339 U.S. 306, 315-16 (1950), that "persons missing or unknown" may be served by publication as long as the proposed publication is "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." However, there did not appear to be one particular print publication that appealed to the interested parties in this case—those affiliated with NASCAR and the motorsports industry—with wide enough circulation for notice by publication. Thus, acknowledging the realities of the twenty-first century and the information age, the Court determined

---

[2] See Lucase G. Paglia & Mark A. Rush, End Game: The Ex Parte Seizure Process and the Battle Against Bootleggers, 4 Vand. J. Ent. L. & Prac. 4, 5 (2002) ("The majority of counterfeiters are street vendors who peddle their goods at flea markets, city kiosks, and live entertainment events. . . . Their vans and trucks serve as 'moving warehouses' that travel from event to event, city to city, in search of unsuspecting consumers. . . . If apprised in advance of a pending motion for injunction, counterfeiters invariably leave with their illicit merchandise and either relocate to a venue beyond the jurisdiction of the court or simply wait until their pursuers have abandoned the cause before restarting their illegal businesses.").

that the most appropriate place for publication was the NASCAR Web site, www.NASCAR.com.[3] Notice of the preliminary injunction hearing was posted on www.NASCAR.com from February 20, 2008, to February 28, 2008.[4]

On February 28, 2008, the Court held a hearing on Plaintiffs' Motion for Preliminary Injunction. No Defendants appeared at the hearing. The Court made the necessary findings of fact and conclusions of law under 15 U.S.C. § 1116(d)(10)(A) and entered a preliminary injunction against Defendants, enjoining them from selling counterfeit merchandise and providing for the seizure of any counterfeit merchandise sold within a ten-mile radius of any racetrack forty-eight (48) hours before or twenty-four (24) hours after any NASCAR race. (Doc. No. 16.) Since the entry of this Order, Plaintiffs have served thirty-eight (38) additional Defendants with the Summons, Complaint, and Preliminary Injunction Order, and have seized counterfeit merchandise from those Defendants.[5][6] The Preliminary Injunction and Seizure Order will remain in effect until thirty-six (36)

---

[3] In 2007, www.NASCAR.com had a total of 1.4 billion page views, attracting more than 3.7 million unique users each month, and ranking as one of the top three sports league sites on the Internet. No print publications offered this level of exposure to those interested in motorsports. (See Crotty Declaration, Doc. No. 12, Ex. B.)

[4] The notice appeared as follows: "LEGAL NOTICE: FEDERAL COURT TO CONSIDER BAN OF COUNTERFEIT MERCHANDISE AT NASCAR RACES." A hyperlink labeled "Click here for details" followed, which linked the user to the formal Notice of Hearing (Doc. No. 15).

[5] The named Defendants in this case are currently: Frank Parsons, David Vasquez, Edward A. Brandt, Paul J. Vanrisseghem, Ceasar Vasquez, Percy Richard, Steven Nezdosky, Alan Krigger, Kevin McCormick, Jonathan RSI Maxwell, Laura Kleinberg, Devonte Walls, Katherine Galvao, Taramati Ramla, Duante Collins, Aloric Carson, Ralph Hailey, Theodore Gough, Jasumt Patel, Jay Govinda, Kevin McNary, Rickie Lyn Berry, Patrick Quaranto, Richard William Spertzel, James David Flahavin, Jonathan William Savage, Quintin Edmonds, Kenneth Youmans, Lacey Green, William Shearin, Jr., James Campbell, Kenneth Wayne Johnson, Jamak Williams, Thomas M. Wood, Thomas Bart Gibson, James Goodheart, Billy Twombly, Kenneth Yoomans, Belinda Archie, Eric Herzog, Caesar Silva, Sesay Suliman, John Clark, Valdora Larsuel, Mary Ann Mastriano, Alan Landy, Geoffrey Meskel, and Anthony Derkas.

The Court notes that it has personal jurisdiction over these Defendants, and others who may be named, because the Act provides for service "anywhere in the United States where [Defendants] may be found." 15 U.S.C. § 1116(a); see also Fed R. Civ. P. 4(k)(1)(C); SEC v. Carrillo, 115 F.3d 1540, 1543-44 (11th Cir. 1997). Venue, however, may be more problematic. Plaintiffs' Complaint alleges that the "substantial part of the events giving rise to Plaintiff's request for relief occurred and continue to occur in this district." (Compl. ¶ 27); see also 28 U.S.C.

hours after the final NASCAR race, the Ford 400 of the Sprint Cup Series, which will take place on November 16, 2008.[7]

## NOTICE PROCEDURE FOR FORFEITURE ACTIONS

It appears unlikely that any Defendant will ever appear to contest Plaintiffs' motions and the Court's orders in this case. Nevertheless, it remains the Court's responsibility to protect the due process and property rights of all the currently named Defendants and other Defendants as yet unknown. The logical conclusion of a counterfeiting case involving property seizures is the conversion of the preliminary injunction into a permanent injunction and the destruction of the infringing articles pursuant to 15 U.S.C. § 1118. There are, however, two major hurdles to reaching this conclusion. First, to destroy goods under § 1118, a Lanham Act violation must have been "established." Taking into account Plaintiffs' history of litigation, it appears unlikely that Plaintiffs

---

§ 1391(b)(2). The Complaint does not clarify what these venue-giving events are, but merely states, "The stock car racing industry enjoys a particularly strong presence and following in [this district, which] . . . more than any other geographic region in the United States, would feel the collective negative economic impact of Defendants' actions." (Compl. ¶¶ 25-26.) The economic impact of Defendants' actions, however, is a separate issue from the events giving rise to the action. Plaintiffs' Memorandum in support of it Motion for TRO provides more details, stating that "there are many individuals and entities who manufacture and distribute Counterfeit Merchandise in and from [this district]." (Pl.'s Mem., Doc. No. 2-7, at 5.) This allegation is sufficient for notice pleading, and has not been challenged as there are, in fact, no challengers to this action. The Court is unsure, however, of this district's central role in this case, as it is not home to any of the various racetracks at issue and does not appear to be home to any of the named defendants.

[7]The Court continues to have some concerns about the propriety of its Preliminary Injunction and Seizure Order. The Act clearly provides that any seizure order granted "shall end not later than seven days after the date on which such order is issued, during which the seizure is to be made." 15 U.S.C. § 1116(d)(5)(C). Despite this strict time limitation, Plaintiffs urged the Court to extend the seizure order into a preliminary injunction effective through the end of the racing season. Because of Plaintiffs' previous history in this district, including seizure orders lasting far more than seven days, and because of the nature of irreparable harm alleged, the Court extended the seizure order despite its misgivings. That seizure order has now been in effect for over seven months. It remains unclear to the Court whether Congress intended for seizures under the Act to continue for so long, when the seven-day statutory limitation does not appear to allow for exception. See Steven N. Baker, The Never-Ending Seizure Order: How Courts Have Granted Immortality to Congress's Mayfly, 26 Cardozo Arts & Ent. L.J. 369, 390 (2008) ("No amount of creative construction can change the words, clearly expressed, placing a seven-day limitation upon seizure orders and explaining that the purpose of such orders is to preserve evidence for eventual trial."). But see Paglia & Rush, *supra* note 2, at 13 ("[A] successful seizure of counterfeit goods need not be the end of the story. The [Act] expressly provides for the conversion of temporary seizure orders into preliminary injunctions.")

will seek a final judgment in this case. Second, assuming the establishment of a Lanham Act violation and a final judgment, Plaintiffs must see to it that all potential claimants, including those as yet unknown, are properly notified of the seizure and forfeiture of the goods. The Court will address these issues in turn.

**A. When a Violation "Shall Have Been Established"**

This case is unusual in that the ultimate remedy sought by Plaintiffs does not appear to be Congress's reason for passing the Counterfeiting and Trademark Act of 1984, namely "to ensure that the injured party is in fact made whole by the relief he or she is granted, and to discourage dilatory tactics in litigation." S. Rep. No. 98-526, at 2-3 (1984), *as reprinted in* 1984 U.S.C.C.A.N. 3627, 3629. In other words, the seizure order, as conceived of by Congress, is meant to serve as an evidentiary mechanism, preserving evidence for trial that might otherwise be destroyed or concealed by the counterfeiter if placed on notice of the litigation. See In re Lorillard Tobacco Co., 370 F.3d 982, 987 (9th Cir. 2004) ("The purpose of the seizure order is to preserve the evidence necessary to bring trademark counterfeiters to justice."); 2-5 Gilson on Trademarks § 5.19(4)(b)(i) (Lexis 2007) ("[T]he purpose of the ex parte seizure is to protect materials from destruction or concealment."). In a counterfeiting case, a successful plaintiff may recover (1) the defendant's profits, (2) any damages sustained by the plaintiff, and (3) the costs of the action. 15 U.S.C. § 1117(a). In fact, such a showing is presumptively sufficient for treble damages. Id. § 1117(b). Thus, having seized counterfeit articles, the statute calls on a plaintiff to present those articles, obtain a judgment, and prove damages.

Plaintiffs, however, followed a different path in years past. In 2003, Plaintiffs successfully obtained a TRO and seizure order from this Court, converted those orders into a preliminary

injunction and seizure order, seized goods for ten months, and then voluntarily dismissed the case without ever having definitively established that the goods were counterfeit. Int. Speedway Corp., et al. v. John and Jane Does, et al., No. 3:03-cv-49 (W.D.N.C.). Plaintiffs followed this pattern in 2004, 2005, 2006, and 2007, always voluntarily dismissing the case after nearly a year of seizing counterfeit goods. Sealed Case, No. 3:04-cv-41 (W.D.N.C.); Sealed Case, No. 3:05-cv-53 (W.D.N.C.); Motorsports Authentics, LLC et al. v. Various John and Jane Does et al., No. 3:06-cv-138 (W.D.N.C.); Motorsports Authentics, LLC, et al., v. Various John and Jane Does, et al., No. 3:07-cv-73 (W.D.N.C.). Plaintiffs were, of course, well within their rights to voluntarily dismiss these cases given the fact that the defendants filed neither an answer nor a motion for summary judgment. Fed. R. Civ. P. 41(a)(1)(A). In fact, no defendant has ever appeared to contest these seizures. A problem, however, remains: If Plaintiffs have voluntarily dismissed every case without ever having obtained a final judgment, whether by trial or default, then they have never "established" a violation of Lanham Act. Thus, they have no statutory authority to destroy or otherwise dispose of the goods under 15 U.S.C. § 1118, and those goods remain *in custodia legis* under § 1116(d)(7). At the preliminary injunction hearing, Plaintiffs' counsel informed the Court that the goods are often donated to charitable institutions and distributed overseas. Noble though this may be, Plaintiffs have been disposing of property in which Defendants, and possibly others, continue to have legal rights, and over which Plaintiffs have no legal title or statutory authority, other than serving as the Court's temporary custodian.

Having discussed these matters with Plaintiffs' counsel during the two hearings in this case, it appears certain that Plaintiffs will again voluntarily dismiss this case before obtaining a final judgment. As mentioned, this is Plaintiffs' legal right. Under this course of action, however, all

seized property, never having been finally adjudicated to be counterfeit, must be returned to Defendants. The Court understands the near impossibility of this task given Defendants' transient nature, as well as the inequity of returning likely counterfeit property to the suspected counterfeiters. Nevertheless, that would be Plaintiffs' burden, never having shown more than a likelihood of success in this action. On the other hand, were Plaintiffs to proceed to a final judgment in this matter, and were they to be successful, they would be free to act in accordance with 15 U.S.C. § 1118.

## B. Notice of Seizure and Forfeiture

While the text of 15 U.S.C. § 1118 dictates that a final judgment against the *in personam* defendants is a necessary precondition to the ultimate forfeiture and destruction of the seized merchandise, other due process concerns lead the Court to conclude that this alone is not sufficient. The seizure of counterfeit goods under section 1116(d) and their destruction under section 1118 contemplates judicial action taken directly against the offending property—relief in the nature of an *in rem* forfeiture. See 2 Dan B. Dobbs, Law of Remedies § 6.4(5) (2nd ed. 1993) ("As a matter of remedial form, [a] seizure [under the Lanham Act] is not an injunction but an in rem action, in which the marshall actually seizes the goods and materials identified in the order.").

"Actions in rem, or 'against the thing,' are designed to adjudicate rights in specific property as against all of the world, and judgments in such cases are binding to the same extent." Darlak v. Columbus-America Discovery Group, 59 F.3d 20, 22 (4th Cir. 1995).[8] Due process therefore

---

[8] The body of law for civil, *in rem* forfeitures has developed over hundreds of years. This body of law was predominantly that of admiralty in the early years of the Union. See, e.g., The Mary, 13 U.S. (9 Cranch) 126 (1815). Forfeiture proceedings have spread far beyond the admiralty context and now apply, by federal and state statute, to "virtually any type of property that might be used in the conduct of a criminal enterprise." Calero-Toledo v. Pearson Yacht Leasing Co., 416 U.S. 663, 683 (1974). For a more extensive discussion of the nature and historical roots of *in rem* forfeiture actions, see B. Frederic Williams, Jr., and Frank D. Whitney, Federal Money Laundering: Crimes and Forfeitures 544-55, 722-37 (1999).

requires that all interested parties, whether known or unknown, be provided with adequate notice and an opportunity to be heard before the Court orders final disposition of the property. Mullane, 339 U.S. at 312-15. Those from whom the property was originally seized have been impleaded as defendants, served with process, and accordingly have received actual notice of these proceedings. Should these named defendants fail to defend and a default judgment be entered against them, the extinguishment of their rights in the seized property under 15 U.S.C. § 1118 would not offend due process. However, because the mere possession of personal property at the time of its seizure is not conclusive of ownership, persons who are potentially interested parties yet remain unidentified are entitled to some additional form of notice and must be provided an independent opportunity to be heard, since they cannot be said to forfeit their rights in the property simply by virtue of an *in personam* judgment against the named defendants.

This *in rem*/*in personam* distinction is relevant to the issue of whom Plaintiffs must notify of the seizure and eventual destruction of the goods (i.e., the forfeiture) and how they must notify them. Nowhere in the Act is there a discussion of whom to notify or how to accomplish notice. The Court is of the opinion that this gap in the statute is due to the fact that the procedure for giving notice in an *in rem* forfeiture action is well established in the Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions, which apply to all "forfeiture actions *in rem* arising from a federal statute." Fed. R. Civ. P., Supp. R. A(1)(B). The Supplemental Rules supply the procedure for giving notice by publication to potential claimants who are unknown. Specifically, Supplemental Rule G(4) provides: (1) the context under which notice by publication must be given, (2) the required contents of that notice, (3) the frequency with which the notice must be published,

and (4) the means of publication.[9] Because the value of the numerous goods seized in this case is likely to be significant, it is certain that notice will be required. Fed. R. Civ. P., Supp. R. G(4)(a)(i). As to content, the notice must (1) describe the property with reasonable particularity, (2) state the time by which a claim and answer must be filed with the Court,[10] and (3) name the attorney for Plaintiffs to be served with the claim. Fed. R. Civ. P., Supp. R. G(4)(a)(ii). As to frequency, the published notice must, given the circumstances of this case, appear at least once a week for three consecutive weeks. Fed. R. Civ. P., Supp. R. G(4)(a)(iii). Finally, as to means, the notice must be published in a way reasonably calculated to notify potential claimants of the action. Fed. R. Civ. P., Supp. R. G(4)(a)(iv). Typically, that means "publication in a newspaper generally circulated in the district where the action is filed, where the property is seized, or where property that was not seized is located." Id. In this case, however, the Court has already determined that the only suitable place of publication is not a newspaper, but a Web site: www.NASCAR.com. Under the facts of this case, that site is the best place "to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." Mullane, 339 U.S. at 315. Notice given in this fashion binds the whole world of unknown potential claimants, including those who may claim innocence but whose property, having been involved in illegal activity, is nonetheless subject to seizure and destruction. See Bennis v. Michigan, 516 U.S. 442, 446 (1996).

All known claimants (i.e., the named Defendants from whom goods have been seized), are

---

[9] The Court notes that although the Supplemental Rules are written in terms of what the government, the typical actor in a forfeiture act, must do, they are equally applicable to a non-governmental body given seizure authority by Congress. See Fed. R. Civ. P., Supp. R. A(1)(B).

[10] Any person who asserts an interest in the property may contest the forfeiture by filing a claim with the Court. Fed. R. Civ. P., Supp. R. G(5)(a)(i). This claim must be filed no later than thirty (30) days after the final publication of notice. Fed. R. Civ. P., Supp. R. G(5)(a)(ii)(B). The claimant must then file an answer or a Rule 12 motion within twenty (20) days. Fed. R. Civ. P., Supp. R. G(5)(a)(iii).

under the *in personam* jurisdiction of the Court, having been provided with purportedly proper service. Therefore, they are on actual notice of these proceedings, and Plaintiffs need not provide them with additional notice. Cf. Fed. R. Civ. P., Supp. R. G(4)(b)(v) ("A potential claimant who had actual notice of a forfeiture action may not oppose or seek relief from forfeiture because of the government's failure to send the required notice.").

Plaintiffs' racing season concludes after the final race of the Sprint Cup Series, the Ford 400, which takes place on November 16, 2008. The Court's Preliminary Injunction and Seizure Order expires thirty-six (36) hours after that race. Within one week thereafter, Plaintiffs shall begin the notice procedures discussed herein.[11] Once these procedures have been implemented, and notice sufficiently published, assuming no claims are timely filed, the Court will entertain a motion for entry of default and default judgment and will determine the final disposition of the property.

## CONCLUSION

The manner in which Plaintiffs have previously approached seizures under the Trademark Counterfeiting Act of 1984 will no longer be allowed by this Court. Plaintiffs may voluntarily dismiss their case at the conclusion of the NASCAR season, but doing so requires that they engage in every possible effort to return the seized goods to Defendants. If Plaintiffs, as they appear to have done since 2003, dispose of the goods without an order from this Court, they will have acted against goods that remain *in custodia legis* and over which they have no statutory authority. In addition, before the Court will make any determination concerning the final disposition of the property,

---

[11]The Court notes that the time between the initial seizures and this notice and the eventual hearing is within the constitutional limit of eighteen months established in the analogous case of United States v. $8,850, in U.S. Currency, 461 U.S. 555 (1983). This is especially true in this case, where no Defendant or other individual with an interest in the property has expressed a desire for an earlier judicial hearing. Id. at 569; see also Barker v. Wingo, 407 U.S. 514, 528 (1972).

Plaintiffs must provide notice sufficient to satisfy the Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions. Once these rules have been satisfied, and all potential claimants have been given notice and an opportunity to be heard, the Court will determine the disposition of the goods according to 15 U.S.C. § 1118.

IT IS SO ORDERED.	Signed: November 6, 2008

Frank D. Whitney
United States District Judge